**UNITED STATES of America, Appellee,**

v.

**David Lloyd NICKENS, Defendant, Appellant.**

**No. 90–1041.**

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1991.

Decided Jan. 29, 1992.

Gabriel J. Chin, by Appointment of the Court, with whom Janet E. Halley and Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., were on brief, for defendant, appellant.

Joseph C. Wyderko, Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez–Romo, U.S. Atty., and Rosa E. Rodriguez Velez, Asst. U.S. Atty., Hato Rey, P.R., were on brief, for U.S.

Before LEVIN H. CAMPBELL, Circuit Judge, BROWN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

* Of the Fifth Circuit, sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant, David Lloyd Nickens, appeals from his conviction in the United States District Court for the District of Puerto Rico. Nickens was indicted and convicted in a jury trial on three counts: importation of cocaine, in violation of 21 U.S.C. § 952(a); possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and arrival in the United States on board an aircraft in possession of cocaine not entered in the aircraft's manifest, in violation of 21 U.S.C. § 955. The district court sentenced Nickens to 95 months imprisonment on each of the three counts, to be served concurrently, 4 years supervised release, and a special assessment of $150.00. On appeal, Nickens asserts numerous trial errors. We affirm.

## I. FACTS

We present the facts in the light most favorable to the government. *United States v. Ortiz–Alarcon,* 917 F.2d 651, 652 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2035, 114 L.Ed.2d 120 (1991); *United States v. Jimenez–Perez,* 869 F.2d 9, 10 (1st Cir.1989).

Nickens arrived in Puerto Rico on an Iberia airlines flight originating in Quito, Ecuador. Because his flight was a continuing flight en route to Madrid, Spain, he was required to wait in an "in-transit" lounge and he did not go through customs. While the passengers were waiting, a customs agent conducted a routine inspection of their aircraft's luggage container. During this inspection the agent discovered two false bottom suitcases—one brown and one violet—containing 2,611.1 grams of cocaine (gross weight). The tags attached to the suitcases were in Nickens' name and matched the claim checks attached to Nickens' tickets, indicating that the suitcases were checked-in by Nickens. Nickens was arrested after he told the customs agent that he was the owner of the two suitcases.

The customs agent searched Nickens and found a suitcase key which opened the brown suitcase, $1,300 in cash, a passport, several identification cards and two round trip airline tickets. One of the airline tick-

ets provided for a round trip from Los Angeles to Quito, Ecuador and back to Los Angeles. That ticket indicated that Nickens did not check any baggage on the first leg of his trip from Los Angeles to Quito. The second airline ticket provided for a round trip from Quito to Madrid, Spain and then back to Quito. The customs agents retrieved a Bible belonging to Nickens from the brown suitcase and his insulin and other medical supplies from the violet suitcase.

At trial Nickens testified that he went to Quito for a vacation and that he was continuing to Spain to obtain treatment for his eyes from an eye clinic in Barcelona. Nickens asserted that his eyesight was severely impaired because of his diabetes and, as a result, he was colorblind.

According to Nickens, shortly after arriving in Quito he lost his only pair of glasses, making it difficult for him to see. He testified that he met two young men in Quito who helped him get around and came to his hotel room the morning he was to leave for Spain. Nickens testified that one of the men asked Nickens to accompany him to the hotel gift shop so that he might purchase something while the other man stayed behind. According to Nickens the man who stayed behind must have switched his suitcases for the false bottom suitcases containing the cocaine. Nickens claimed that he did not notice the switch, even though his own suitcases were blue, because of his color blindness. While Nickens acknowledged that some of the contents of the suitcases belonged to him, he stated that they were placed there when the suitcases were switched.

A jury returned a guilty verdict on all counts and the court sentenced Nickens accordingly. This appeal followed.

## II. DISCUSSION

Nickens chiefly makes six claims of error: (1) that two of the jurors at his trial were not proficient in English; (2) that the court's instructions to the jury on the presumption of innocence and reasonable doubt were erroneous; (3) that the prosecu-

tor made numerous improper statements in her rebuttal argument; (4) that the court improperly admitted evidence of his prior conviction; (5) that the district court abused its discretion in not dismissing his case in light of a discovery violation committed by the government; and (6) that his Fifth Amendment privilege against self-incrimination was an absolute defense to prosecution under 21 U.S.C. § 955. We address each of these claims.

### A. Presence of Two Non–English Speaking Jurors

■ Nickens contends that the district court committed reversible error in denying his motion for a new trial based on Nickens' post-trial discovery that two jurors who had served on his jury (Yolanda Torres and Sonia Sanchez) were subsequently stricken for cause by another magistrate judge during jury selection in an unrelated case because of their lack of proficiency in English. The court below gave its reasons for denying the motion in a published order. *United States v. Nickens*, 729 F.Supp. 1407 (D. Puerto Rico 1989). It was the court's conclusion, having reviewed the transcript of the *voir dire* in the present case, that "defendant has [not] brought himself within the 'clear injustice' exception which would allow defendant to challenge the qualification of a juror after trial has concluded." *Id.* at 1408.

■ Denial of a motion for a new trial will be reversed only for abuse of discretion. *Real v. Hogan*, 828 F.2d 58, 61 (1st Cir.1987); *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622, 632 (1st Cir.1983),

cert. denied, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). Where the motion rests on a challenge to the qualification of a juror, our standard of review is highly deferential because "the district court is closer to the action and has a better 'feel' for the likelihood that prejudice sprouted." *United States v. Uribe*, 890 F.2d 554, 562 (1st Cir.1989). In this case we hold that the district court did not abuse its discretion.

■ At the *voir dire*, each of Nickens' jurors was questioned in English by the magistrate,[1] and counsel had the opportunity to hear the two jurors' responses and to observe their demeanor. *Nickens*, 729 F.Supp. at 1408. After asking a number of questions to all prospective jurors collectively, the magistrate then interviewed each juror individually.[2] He introduced this process as follows:

> Okay. I'm going to call all the jurors. As your name is called step up to the microphone, and you state your name and your number, and what you do for a living, your occupation for the last five years, the occupation of your spouse for the last five years, where you live and what municipality—that's your home address—it [sic] you served on juries before, how many civil cases and criminal cases you're [sic] served on, and if you're [sic] on more than one criminal case, I want to know if your verdicts have been the same or if they've been different. . . .

When her name was called, juror Yolanda Torres responded, "my name is Yolanda Torres. I live in—my number is 40. I live

---

1. Nickens' counsel made no objection to the magistrate's presiding over the impanelment *voir dire*. 729 F.Supp. at 1409. For this reason, employment of the magistrate in what would otherwise have been an impermissible role was acceptable. *See Peretz v. United States*, —— U.S. ——, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) ("a defendant has no constitutional right to have an Article III judge preside at a jury selection if the defendant has raised no objection to the judge's absence."); *United States v. Martinez–Torres*, 944 F.2d 51 (1st Cir.1991) (following *Peretz*).

The district court stated that each of the potential jurors "was questioned in English by the undersigned with an eye to their proficiency in spoken English as well as their ability to under-

stand the questions posed in English. Their proficiency and fluency in English was clearly established. . . ." 729 F.Supp. at 1408. The court apparently meant that the magistrate, at the presiding judge's direction, had questioned the jurors. For procedures commonly followed in screening Puerto Rico jurors for language proficiency, *see Thornburg v. United States*, 574 F.2d 33, 35 (1st Cir.1978).

2. The district judge stated that questions proposed by the defendant had been posed to the panel of prospective jurors. 729 F.Supp. at 1409. This suggests that in addition to posing standard questions, the magistrate included others requested by defense counsel.

in Bayamon all my life, not work, and I study In Interamerican University. And I had one criminal case." Juror Sonia Sanchez responded "good morning. My Name is Sonia Sanchez. 37. I live in Miramar. I housewife. I do work in my home, technics attorneys, or secretaries. My husband work on attorney municipal attorney, and one civ—eh—criminal case." The magistrate then asked her "what's the case? one criminal?" and she responded "one criminal sir." Defense counsel raised no question as to either of these two jurors after they had spoken, either by requesting further inquiry into their English proficiency or challenging them for cause on the basis of an inability to speak and understand English. During and after the trial, neither of the jurors indicated any difficulty in understanding the proceedings.

We have held in similar cases where timely objections were not registered that later doubts as to a juror's linguistic competence will not constitute grounds for relief without a showing of "manifest" or "clear" injustice. *United States v. Cepeda Penes*, 577 F.2d 754, 759 (1st Cir.1978); *Thornburg v. United States*, 574 F.2d 33, 36 n. 5 (1st Cir.1978); *see also United States v. Paz Uribe*, 891 F.2d 396, 401 (1st Cir.1989), *cert. denied*, 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990) (citations omitted). In *Cepeda Penes*, appellant sought a new trial because, as here, a juror who sat on his trial was dismissed during impanelment in a subsequent unrelated case for inability to understand English. This court held that appellant had waived any objection that could have been appropriately raised during his *voir dire*. *Cepeda Penes*, 577 F.2d at 759. As the record identified no patent disqualifying incapacity, and defendant had heard the juror at *voir dire* and could have then raised the issue of language competence, the court found no clear injustice because, in a later unrelated case, the same juror was dismissed as being linguistically unqualified. *Id.*

Nickens attempts to distinguish *Cepeda Penes* on the ground that the juror there may have been needlessly excused in the later case. We noted in our opinion that the juror was excused by a visiting judge whose native language was English and about whose evaluation of the juror's English the *Cepeda Penes* judge expressed doubts. *Cepeda Penes*, 577 F.2d at 759 (judge suggested the juror may have become confused by the visiting judge's lack of a Spanish accent). But a similar-type argument can be made in the present case. The magistrate judge who, in the end, dismissed Sonya Sanchez in the subsequent case appears from the record to have done so only reluctantly, seeming to feel she was qualified. She herself strenuously insisted that her understanding was good even though she admitted to speaking English ungrammatically. As for Yolanda Torres, the record reveals little as to her ability, as she was excused with little or no inquiry after the government voiced no objection. Thus, the reported circumstances surrounding dismissal of these jurors were scarcely conclusive as to their incapacity. Nor can we say, based on the conversations of these two jurors as reported in the records of both proceedings, that they manifestly could not understand and communicate in English. While some grammatical errors appear, they both seem to have understood the questions put to them in English and to have been able to respond at some level of intelligibility. In such circumstances, the rationale of *Cepeda Penes* is that "there must be limitations on the right of a defendant to reopen proceedings when the objection is based on facts that could have, and should have, been pressed at a time when the district court could have acted on the challenge." *Id.* Had the issue of English competency been raised at the *voir dire*, the magistrate judge would have then and there spoken further to the jurors and listened further to their spoken English. The opportunity to make such further evaluation was irretrievably lost by the failure to object. As the court below stated, paraphrasing our opinion in *Cepeda Penes*,

> [t]he nature of the dual language requirement in Puerto Rico, the fact that Puerto Rican defense counsel are well aware of the problems in juror selection, and sound policy regarding finality of

verdicts in the absence of strong reasons to impeach such verdicts, all point to our disposition of this matter. *Nickens,* 729 F.Supp. at 1408; *see Cepeda Penes,* 577 F.2d at 759.

We hold that where the jurors, individually, were required to speak some English in the presence of defendant and counsel at the *voir dire,* where counsel thereafter raised no objection and sought no further inquiry, and where the record itself does not compel the conclusion that the jurors were necessarily incompetent, there was no clear or manifest injustice in their service. We, therefore, reject appellant's claim of error based on the later rejection of these same jurors for lack of English proficiency in another case.

### B. *Jury Instructions*

■ Nickens contends that the court's jury instructions were defective in two respects. Because these objections are being raised for the first time on appeal, we review only for plain error. *See United States v. Waldeck,* 909 F.2d 555, 561 (1st Cir.1990); *United States v. Campbell,* 874 F.2d 838, 841 (1st Cir.1989); *Figueroa v. Aponte–Roque,* 864 F.2d 947, 951 (1st Cir. 1989). The plain error standard is high, *United States v. Hunnewell,* 891 F.2d 955, 956 (1st Cir.1989), and only "errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below" can justify reversal. *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.) *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). Without endorsing their form, we do not find the jury instructions here so egregious as to constitute plain error.

#### 1. Presumption of Innocence

■ Nickens contends that the court's jury instructions were inconsistent with the presumption of innocence. At the beginning of the trial the court stated:

Since you will be called upon to decide the facts in this case, you should give careful attention to the testimony and evidence presented for your consideration. You should keep an open mind and

you should not form or express an opinion as to the guilt or innocence of the defendant until the case is finally submitted to your consideration.... Until that time, keep an open mind. Do not form or express an opinion as to the guilt or innocence of the defendant. Do not discuss this case with anyone else, not even among yourselves....

After the closing arguments, but before the final jury charge the court reiterated that

[i]t is important at this time that you still observe my instructions as not to form an opinion or express an opinion as to the guilt or innocence of this defendant because still there is at least one step that is important for you to reach a verdict, my instruction as to the law.

Nickens contends that these instructions effectively negated the presumption of innocence because no juror can presume a defendant to be innocent and simultaneously consider his "guilt or innocence" to be an open question. We do not find that the court's jury instructions taken as a whole had the effect of telling jurors not to presume the defendant's innocence as required by law.

The presumption of innocence is a basic premise of our criminal legal system. *United States v. Clotida,* 892 F.2d 1098, 1105–06 (1st Cir.1989). The government carries the full burden of proving a criminal defendant's guilt beyond a reasonable doubt. If the government fails to carry this burden, then the defendant "is entitled to a 'not guilty' verdict, whether or not the jurors believe he is innocent." *United States v. Edilberto Mendoza–Acevedo,* 950 F.2d 1, 4 (1st Cir.1991). We do not agree, however, that instructions not to form an opinion about defendant's guilt or innocence until the case is finally submitted would normally suggest to the jury that the government's burden of proving guilt is equal to defendant's burden of proving innocence. The challenged instruction merely told the jury not to evaluate the evidence it would be hearing until the evidence was all in and the court had rendered its instructions. The presumption of innocence

does not eliminate the jury's role of evaluating evidence and reaching an informed verdict. Telling a jury to postpone making a final judgment until all the evidence has been presented, does not instruct the jury as to the weight or effect that should be given to any aspect of that evidence—nor to the presumption of innocence—when making their final judgment.

■ Jury instructions must be gauged "in the context of the charge as a whole, not in isolation." *United States v. Boylan*, 898 F.2d 230, 244 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *see also Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("a single instruction to a jury may not be judged in artificial isolation"); *Mendoza–Acevedo*, 950 F.2d at 9. In this case, during the final jury instructions, the court stated that "[t]he law does not require a defendant to prove his innocence or produce any evidence at all. . . . The government has the burden of proving him guilty beyond a reasonable doubt, and if it fails to do so, you must acquit him." These latter instructions correctly apprised the jury of their responsibility. *See Mendoza–Acevedo*, 950 F.2d at 4. Reviewing for plain error, we are satisfied that the instructions at issue, taken as a whole, do not require reversal of Nickens' conviction. *Id.* 950 F.2d at 5.

### 2. Reasonable Doubt

■ Nickens contends that the court's instructions to the jury as to reasonable doubt were also erroneous and require reversal of his conviction. The court instructed the jury that:

The government has the burden of proving [defendant] guilty beyond a reasonable doubt, and if it fails to do so you must acquit him.

Thus, while the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proved beyond all possible doubt. It is only required that the government's proof withstood any reasonable doubt concerning the defendant's guilt.

A reasonable doubt is a real doubt based upon reason and common sense after a careful and impartial consideration of all the evidence in the case.

If the proof is such that you will hesitate to rely and act upon it, on the most important of your own affairs, then the Government has failed to prove that the defendant is guilty beyond a reasonable doubt.

Nickens objects to this instruction on two grounds. First, he objects to the equation of "reasonable doubt" with "real doubt." Second, Nickens complains that the last part of the instruction reduces the government's burden of proof by comparing the jury's deliberations with personal decision-making.

The instructions challenged here are basically similar to ones challenged unsuccessfully in *United States v. Rodriguez–Cardona*, 924 F.2d 1148 (1st Cir.1991).[3] The defendant in *Rodriguez–Cardona* also complained that the reasonable doubt "instructions trivialized the standard of proof and thereby lessened the government's

---

**3.** In *Rodriguez–Cardona,* the judge gave the following reasonable doubt instruction:

The government has the burden of proving [the defendant] guilty beyond a reasonable doubt, and if the government fails to do so, you must acquit.

Thus, while the government's burden of proof is a strict or a heavy burden, it is not necessary that the defendant's guilt be proved beyond all reasonable [sic] doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt.

Now, a reasonable doubt is a real doubt based upon reason and common sense after a careful and impartial consideration of all the evidence in the case. The jury will remember that the defendant is never to be convicted on mere suspicion or conjecture.

Proof beyond a reasonable doubt therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

Consequently, ladies and gentleman of the jury, if you are convinced that the accused had been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

*Rodriguez–Cardona,* 924 F.2d at 1159–60.

burden." Reviewing for plain error this court stated

> [t]his court has frequently expressed its displeasure at reasonable doubt instructions that refer to personal decision-making as the standard.... Nevertheless, although the instruction was of a type disfavored by this court, it did not constitute the plain error necessary for reversal under the circumstances.... Taken as a whole, the instruction accurately placed the burden of proof.

*Rodriguez–Cardona*, 924 F.2d at 1160 (citations omitted); *see also United States v. Campbell*, 874 F.2d 838, 841 (1st Cir.1989) (instruction defining reasonable doubt as "the kind of doubt that would make a reasonable person hesitate to act" does not constitute plain error); *United States v. Sorrentino*, 726 F.2d 876, 883 (1st Cir. 1984) (instruction that proof beyond a reasonable doubt is "proof that you would not hesitate to act and rely on in the most important of your own affairs," while "appeal generating, is not plain error"). Because we find this case indistinguishable from *Rodriguez–Cardona*, we hold that here too, the instruction on reasonable doubt, while not to be condoned, did not constitute plain error.[4]

## C. *Prosecutor's Rebuttal Argument*

 Nickens contends that his conviction on all counts should be reversed because the prosecutor, in her rebuttal argument, injected her personal beliefs about Nickens' guilt, suggested an alliance between the prosecutor and the jury, and made damaging accusations about Nickens' role in a fictional drug conspiracy. As no contemporaneous objections were made to these statements, we again review only for plain error. *United States v. Moreno*, 947 F.2d 7, 8 (1st Cir.1991); *United States v.*

*Rodriguez–Estrada*, 877 F.2d 153, 158 (1st Cir.1989); *United States v. Mejia–Lozano*, 829 F.2d 268, 272 (1st Cir.1987). While we disapprove of many of the prosecutor's statements, we do not think they amounted to plain error.

Nickens first complains that the prosecutor continuously stated her personal beliefs about his credibility and other critical facts in the case throughout her rebuttal argument. Moreover, Nickens contends that the prosecutor suggested an alliance between herself and the jury by repeatedly using the word "we" in her statements. The prosecutor opened her rebuttal argument stating "I am sorry to say that I do not agree with anything [defense counsel] said." Recounting various aspects of Nickens' testimony, and defense counsel's argument, the prosecutor stated that Nickens' testimony as to what happened to him "is totally unbelievable and it is not logical and it does not make any sense whatsoever;" and that "things do not happen that way.... I submit to you that is not possible and that is not believable." At other points in the argument the prosecutor ended her review of the evidence with statements such as "[h]e thinks that we are going to believe him. We are not going to believe him;" "can we really believe that after he lost his glasses ... he went with four students ... that doesn't make sense;" and "can we really believe that this man went to a hotel gift shop with one of those students ... and that gift shop did not sell to anybody who was not a hotel guest?" Finally, expressing her disbelief of Nickens' testimony more blatantly, the prosecutor suggested that Nickens could not explain why his insulin was in the bags that he claimed were not his "[b]ecause those are his bags. And sometimes when

---

**4.** While the instructions in *Rodriguez–Cardona* also equated reasonable doubt with real doubt, the defendant in that case apparently did not focus upon, and the court did not address, that portion of the instructions. Here, in contrast, defendant argues that equating reasonable doubt with real doubt reduces the government's burden because in common parlance, to have a "real doubt" is to think there is a high likelihood of error. To find reasonable doubt, however, such a high likelihood of error is not required.

In *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the United States Supreme Court criticized instructions which define reasonable doubt as a "substantial doubt, a real doubt." Nevertheless, the Court held that while such an instruction is confusing, it is "perhaps not in itself reversible error." *Taylor*, 436 U.S. at 488, 98 S.Ct. at 1936.

you are lying, even though you have provided a perfect story, sometimes it does come out that something does not make sense." She also stated "this man is not really blind. This man is not really telling the truth.... [h]e made-up that whole story so you could be misled."

■ This court has repeatedly stated that it is improper for a prosecutor to inject personal beliefs about the evidence into a closing argument. *See, e.g., Mejia–Lozano,* 829 F.2d at 273; *United States v. Cresta,* 825 F.2d 538, 555 (1st Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *United States v. Rosa,* 705 F.2d 1375, 1379–80 (1st Cir.1983); *United States v. Flaherty,* 668 F.2d 566, 596–97 (1st Cir.1981). It is also inappropriate for a prosecutor to call defendant a liar. *Rodriguez–Estrada,* 877 F.2d at 159 ("the prosecutor's obligation to desist from the use of pejorative language and inflammatory rhetoric is every bit as solemn as his obligation to attempt to bring the guilty to account."). There can be no doubt the prosecutor here violated these fundamental precepts.

Our mission, however, is not simply to decide whether the prosecutor's remarks were improper. Reversal is appropriate only if the improper remarks were so egregious as to amount to plain error. *United States v. Young,* 470 U.S. 1, 14, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) ("the dispositive issue under the holdings of this Court is not whether the prosecutor's remarks amounted to error, but whether they rose to the level of "plain error" when he responded to defense counsel"); *United States v. Maccini,* 721 F.2d 840, 846 (1st Cir.1983). To constitute plain error the misconduct must be so egregious that it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Young,* 470 U.S. at 15, 105 S.Ct. at 1046. We evaluate the prosecutor's comments, moreover, "not in sterile isolation, but within the framework and context of the actual trial." *Rodriguez–Estrada,* 877 F.2d at 159.

In this case, the tainted remarks appeared in the prosecutor's rebuttal to defense counsel's own inflammatory closing argument. Defense counsel had made the following statements at various points in his closing argument:

"[defense's character witnesses] told you the truth about David."

"what did the agents do? ... They came here and they tried to square his case away to get him convicted. They lied about him."

"Ruiz came up here and said, 'oh David told me ... he had lost the key. Does that make sense.... Hey, that is a lie. Wouldn't agent Ruiz have put that in his report ...? Sure he would have. Man, that guy is an expert.... But you know why it is not here? Because he made that up to get this guy convicted. Are you going to let the government act that way? You shouldn't.... They have to come here with the truth. They can't come here to make up stories to get a guy in a prison."

"Isn't that disgusting, that people would come to a court of law, agents ... would come to a court of law and make-up stories about David to convict him? I mean, you can't let them get away with it."

"They lied, they made it up afterwards as they went."

"You saw the way [defendant] testified. He is believable."

These remarks suffer from the same impropriety as did the prosecutor's rejoinder to them. Defense counsel indicated, as his own view, that the prosecution had conspired to railroad an innocent man, that the government witnesses were lying, that the prosecution's case was a fabrication, and that Nickens "is believable." Counsel for *both parties* have an obligation "to confine arguments to the jury within proper bounds," and defense counsel, no less than the prosecutor, "must refrain from interjecting personal beliefs into the presentation of his case." *Young,* 470 U.S. at 8–9, 105 S.Ct. at 1043.[5]

---

**5.** ABA Standard of Criminal Justice 4–7.8 provides:

(b) It is unprofessional conduct for a lawyer to express a personal belief or opinion in his

The overall prejudicial effect of the prosecutor's improper remarks must be evaluated in light of defense counsel's analogous impropriety in provoking them. In *United States v. Young*, the United States Supreme Court recognized the "invited response" or "invited reply" rule. Under this, "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* at 12–13, 105 S.Ct. at 1045. Thus, we have held that "a prosecutor deserves some leeway to respond to inflammatory attacks mounted by defense counsel." *Rodriguez–Estrada*, 877 F.2d at 158; *see also Cresta*, 825 F.2d at 556 ("prosecutor is given somewhat greater leeway in rebuttal to rehabilitate his witnesses in response to defense counsel's inflammatory statements"); *Mejia–Lozano*, 829 F.2d at 274; *Maccini*, 721 F.2d at 846 (prosecutor's improper statements must be viewed within the context of appellant counsel's own style and verbiage). Here, defense counsel's remarks set the tone for the prosecutor's rebuttal. In her initial closing argument, the prosecutor made none of the offensive comments complained of in her rebuttal. It was only after defense counsel, in his closing argument, repeatedly expressed his personal beliefs, accused prosecution witnesses of lying, and suggested a government conspiracy to convict Nickens that the prosecutor, by way of rebuttal, engaged in the same kind of inflammatory discourse.

■ Similarly, the prosecutor's references to Nickens' involvement in a sophisticated drug trafficking scheme—the source of Nickens' second objection to the prosecutor's rebuttal argument—were also "invited" by defense's discussion of the way drug traffickers operate. *See Rodriguez–Cardona*, 924 F.2d at 1154. During the course of his closing argument defense counsel stated:

client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence, or to attribute the crime to another person unless such an inference is warranted by the evidence.

Use your common knowledge, your common sense. Drug traffickers have been caught putting narcotics in vans, commercial airlines, cars that don't belong to them. That's nothing unusual.... And why do they do this? Of course. To avoid getting caught.... It's very logical for a trafficker to want to avoid placing himself in that jeopardy and letting someone else take the rap. And I submit to you that is exactly what's happened in this case.
But, you know, traffickers don't operate, you know in a likely fashion. They operate in a lot of different ways. They are people that have a lot of tricks ... and they take advantage of people. They use people....

In her rebuttal, the prosecutor responded with the following statements:
[t]his man, the defendant is a drug trafficker, and he deals and he sells cocaine. This cocaine is part of his drug trafficking; ...
he goes to Quito, Ecuador, not for the mountains, not because it's beautiful, not because its peaceful. He goes to get the drug, and he goes to Madrid to sell the drug. He sells the drug in Madrid and comes back to Quito, because that is evidence in this case, he comes back to Quito ... and he is paid in cash or with cocaine so that he can go back to Los Angeles and sell it in Los Angeles....
I submit to you that does make sense. And the defense counsel wanted an explanation and I gave it to him, and you must understand that is the way drug traffickers work, not Juan and Ricardo, 18 years, 19–year–old students who will give this unknown man $30,000 worth of cocaine so that he can disappear.

Nickens argues that the prosecutor's remarks went beyond the evidence, being suggestive more of facts known to the prosecutor than simply of inferences the jury might wish to draw from the evidence. Unfairness to Nickens was mitigated, how-

(c) A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury.

ever, by the fact that the prosecutor was responding to defense counsel's own off-record vouching for Nickens' scenario. That the prosecutor was responding is shown by her statement that she was giving defense counsel the "explanation" he was seeking.

Nickens would have us find plain error on the authority of *United States v. Santana–Camacho*, 833 F.2d 371 (1st Cir.1987). But the circumstances in that case were considerably more egregious and less excusable. In *Santana–Camacho*, the court found plain error where the prosecutor made a remark that "was not made in response to any improper statement made by the defense counsel ... [it] lacked any basis in the evidence and, indeed, contradicted the evidence." *Santana–Camacho*, 833 F.2d at 375. Here in contrast, the prosecutor's overblown remarks were in response to overblown defense rhetoric. And they were not themselves lacking in "any basis in the evidence." *Id.* Nickens' tickets established that his travel route was Los Angeles to Quito, Quito to Madrid, Madrid to Quito and Quito to Los Angeles. Moreover, the tickets from Los Angeles to Quito did not indicate that he had checked *any* baggage when he left Los Angeles, even though he had two suitcases with him when he left Quito. A jury might reasonably infer from such circumstances that drug trafficking was, indeed, Nickens' object.

We do not suggest that a prosecutor has license to respond in kind to a defense counsel's improper remarks. "[T]wo wrongs do not make a right." *Rodriguez–Estrada*, 877 F.2d at 158; *see also Young*, 470 U.S. at 11, 105 S.Ct. at 1044. An appropriate remedy in such circumstances, which both parties failed to take, is a contemporaneous objection. Neverthe-

less, in light of defense counsel's own inflammatory and suggestive statements, the strength of the evidence against Nickens and the judge's clear instructions to the jury,[6] we hold that the offending conduct did not "so poison[] the well that the trial's outcome was likely affected." *Mejia–Lozano*, 829 F.2d at 274. Under the circumstances, the prosecutor's remarks were not plain error.

### D. *Prior Conviction*

Over Nickens' objection, the district court permitted the prosecution to present evidence, in its case in chief, that in 1984 Nickens had pled guilty and had been sentenced in the California Superior Court on three felony counts for one gram sales of cocaine. Nickens claims that the admission of these "prior bad acts" was error and requires reversal of his convictions on all counts.

Under Fed.R.Evid. 404(b), evidence of a prior conviction "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Fed.R.Evid. 404(b). It may be admissible, however if it has some "special relevance" to a material issue such as proving "motive opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.; see, e.g., United States v. Hadfield*, 918 F.2d 987, 994 (1st Cir. 1990); *United States v. Ferrer–Cruz*, 899 F.2d 135, 137 (1st Cir.1990); *United States v. Rubio–Estrada*, 857 F.2d 845, 846–47 (1st Cir.1988); *United States v. Rivera–Medina*, 845 F.2d 12, 15–16 (1st Cir.), *cert. denied*, 488 U.S. 862, 109 S.Ct. 160, 102 L.Ed.2d 131 (1988); *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 579–80 (1st Cir.), *cert. denied sub nom., Latorre v.*

---

6. Before closing arguments, the judge instructed the jury that:

It is your recollection that will control. So regardless of what the attorneys say, it is your recollection as to the facts of the case that will control.

During his final instructions to the jury, the judge stated

[r]emember that any statements, objections or arguments made by the lawyers are not evi-

dence in the case. The function of the lawyers is to point out those things that are most significant to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.

*United States,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987).

Even if such evidence is offered for a purpose other than to show propensity or bad character, however, it is still inadmissible if the district court determines that its prejudicial effect outweighs its probative value. *See* Fed.R.Evid. 403; *see also Hadfield,* 918 F.2d at 994; *Ferrer–Cruz,* 899 F.2d at 138; *Rubio–Estrada,* 857 F.2d at 847; *Rivera–Medina,* 845 F.2d at 15–16; *Gonzalez–Sanchez,* 825 F.2d at 580.

In this case, the district court admitted the evidence of Nickens' prior felony conviction for one gram sales of cocaine on the grounds that it was "probative of [Nickens'] knowledge and intent." The court concluded that "in both instances cocaine was involved" and the two acts "merely involve[d] different steps in the narcotics distribution chain." The court also concluded that the "probative value of [Nickens'] prior conviction outweighe[d] the possible prejudicial impact it might have."

Nickens contends that it was error to admit the prior conviction because it failed both steps of the admissibility analysis. First, Nickens asserts that the prior conviction could not have been admitted to prove knowledge and intent since knowledge and intent were not at issue in this case. According to Nickens, the case did not turn on whether he *knew* what cocaine was, and he did not claim that he acted accidently or without intent, but rather he asserted that he did not commit the crime. We disagree.

Knowledge and intent were, in fact, the central issues at trial. Nickens did not deny that there was cocaine in the suitcases, or that the suitcases were brought into the United States and checked under his name. Rather, his defense was that he was an innocent bystander who was duped, that the suitcases had been switched, that he did not know that they contained cocaine, and that while he had claim tags for the suitcases he was not involved in any efforts to import cocaine. Indeed, in his closing argument, defense counsel urged the jury to acquit Nickens because "all

three charges … require knowledge and intent. And that's what's lacking in this case."

As knowledge and intent were plainly at issue, the question becomes whether or not the evidence of the prior conviction would allow a juror to make at least one inference probative of Nickens' knowledge and intent that does not include his character as a necessary link. *See Ferrer–Cruz,* 899 F.2d at 137; Weinstein & Berger, *Weinstein's Evidence,* ¶ 404[12], at 404–84 ("the proffer of the evidence must … convince the court that the other crimes evidence alters the probability of the defendant's having the requisite state of mind termed intent."). In past similar drug trafficking cases, this circuit has repeatedly held that a prior involvement with drugs is admissible to prove knowledge and intent.[7] *Hadfield,* 918 F.2d at 994; *see, e.g., Ferrer–Cruz,* 899 F.2d at 138 (prior drug conviction admissible to prove knowledge of cocaine in car); *Rubio–Estrada,* 857 F.2d at 847–48 (prior drug conviction admissible to prove knowledge of cocaine in house and intent to distribute); *United States v. Simon,* 842 F.2d 552, 553–55 (1st Cir.1988) (prior drug conviction admissible to prove defendant's knowledge that package contained drugs and not books and to establish intent to distribute); *United States v. Molinares Charris,* 822 F.2d 1213, 1220–21 (1st Cir. 1987) (prior drug conviction admissible to refute defendant's claim that he was merely present on a boat carrying drugs).

The prior conviction in this case was relevant to both Nickens' knowledge that there was cocaine in the suitcases and to his intent to distribute it. The jury might have drawn the permissible inference that a person who has had experience in selling cocaine was more likely than one without such experience to know how drug traffickers operate. Such a person, the jury might infer, is more likely to be familiar with how to conceal cocaine and with false bottom suitcases, and is less likely to have been fooled by seemingly friendly young men eager to come to the aid of a complete

---

7. While defendant cites *United States v. Lynn,* 856 F.2d 430 (1st Cir.1988) as pointing in a different direction, the vast majority of our case law is as we describe.

stranger. Moreover, the jury may have inferred that persons who have distributed cocaine in California, are more likely than those who have not, to want to import cocaine from Ecuador. *Simon,* 842 F.2d at 553. As the district court recognized, the two acts "merely involve[d] different steps in the narcotics distribution chain." While there is a possibility that jurors may draw impermissible inferences about defendant's character or propensity from the fact of his prior conviction, such a possibility is irrelevant to the first step of the admissibility analysis and to Rule 404(b)'s absolute ban. *Ferrer–Cruz,* 899 F.2d at 138. The evidence survives the first step of the analysis as long as "at least one permissible inference is possible." *Id.; see also Rubio–Estrada,* 857 F.2d at 846–47; *Gonzalez–Sanchez,* 825 F.2d at 579–80; *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir. 1982).

▇▇▇▇ Nickens contends that even if his prior conviction had some special relevance for proving knowledge and intent, that relevance was so attenuated that the prejudicial effect of the conviction far outweighed its probative value. Consequently, Nickens argues that the evidence failed the second step of the admissibility analysis. We review a district court's balancing of probative value against prejudicial effect only for abuse of discretion. *See Ferrer–Cruz,* 899 F.2d at 138; *Rivera–Medina,* 845 F.2d at 16; *Simon,* 842 F.2d at 553; *Gonzalez–Sanchez,* 825 F.2d at 580.

We would agree that the probative value of Nickens' prior conviction to his knowledge and intent can be termed "cumulative" in the sense that there were other sorts of evidence tending to establish Nickens' knowledge of the cocaine in the suitcases and his intent to carry out the importation. While not necessarily overwhelming, the other evidence was substantial. Thus, it was brought out that Nickens' name tags were on the suitcases, that he possessed the matching baggage claim checks, that medical supplies that he said belonged to him were in the suitcases, that he possessed a key to one of the suitcases, and that his ticket from Los Angeles to Quito did not indicate that he had checked any bags out of Los Angeles. This mostly circumstantial evidence, if carefully attended by the jury, made his story of a suitcase "switch" rather implausible on its face. It would have supported—although not necessarily compelled—a guilty verdict even had the prior conviction been excluded. As Nickens argues, there is unquestionably some risk that a jury will infer bad character from the fact of a prior conviction. *Simon,* 842 F.2d at 555. Nevertheless, the relevant question is not whether Nickens was prejudiced by the admission of the prior conviction evidence, but whether he suffered *unfair* prejudice. *See* Fed. R.Evid. 403; *see also Gonzalez–Sanchez,* 825 F.2d at 581; *Onujiogu v. United States,* 817 F.2d 3, 6 (1st Cir.1987). While another judge might have struck a different balance in weighing the prejudicial effect of this evidence against its probative value, *Simon,* 842 F.2d at 555, the district court's ruling "did not fall [outside] the ambit of reasonable debate." *Rivera–Medina,* 845 F.2d at 16 (citation omitted). Although the government's case was strong without the prior conviction, who is to say that it would have carried the day had the conviction been left out? The defense argued that Nickens was a respectable citizen travelling for recreational and medical reasons who was caught up in a Kafkaesque plot. Given that "only rarely—and in extraordinary compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect" *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1340 (1st Cir.1988), and given that the court minimized prejudice to Nickens by giving clear limiting instructions to the jury,[8] we are satisfied that the

---

8. Prior to the government's presentation of the evidence of Nickens' prior conviction, the district court gave a cautionary instruction to the jury stating:

I instruct you that evidence of those sales is not presented to you and you should not consider it to prove that because defendant was guilty of those charges, he committed or is guilty of the charges you are now considering.

district court did not abuse its discretion in admitting the evidence of Nickens' prior drug conviction.

### E. *Discovery Violation*

Nickens contends that his convictions on all counts must be reversed because the government, in violation of Fed. R.Crim.P. 16(a)(1)(A)[9] failed to disclose during pre-trial discovery, an oral statement allegedly made by Nickens and presented during the government's case-in-chief. At trial customs agent Ruiz testified that, upon searching Nickens, he found a suitcase key which opened one of the two suitcases that were checked to Nickens. Agent Ruiz then testified that he asked Nickens "where was the other key" and that Nickens replied "I lost it." On redirect, Agent Ruiz testified that he had not informed the government of Nickens' alleged oral statement until five days earlier. At the close of the government's case, Nickens moved to dismiss the indictment on the ground that the government had violated Fed.R.Crim.P. 16(a)(1)(A) by failing to provide the discovery of Nickens' statement that he had lost the key. The district court denied the motion stating that

> [i]n this case I believe the government has substantially complied with [its] strict duty [to make discovery initially and continuously thereafter], I don't believe that the omission of two little small portions of the testimony amounts to bad faith, or that they tried to suppress those statements in order to prejudice the de-

fendant, and I think under those grounds that the remedy of dismissing is not appropriate.

Nickens then moved for a judgment of acquittal which the court also denied.

A district court's ruling on the effect of a failure to provide pretrial discovery is reviewed only for abuse of discretion. *United States v. Melucci,* 888 F.2d 200, 203 (1st Cir.1989); *United States v. Samalot Perez,* 767 F.2d 1, 4 (1st Cir.1985). A defendant must prove that the alleged violation prejudiced his case to succeed in obtaining a reversal on appeal. *United States v. Hemmer,* 729 F.2d 10, 13 (1st Cir.), *cert. denied, Randazza v. United States,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984). We are satisfied that Nickens was not prejudiced by the government's action.

In this case the district court was satisfied that the government's failure to produce Nickens' oral statement was not a bad faith effort to prejudice him. Moreover, defense counsel took full advantage of the opportunity to cross-examine Agent Ruiz, eliciting from him the admission that Nickens' oral statement had not been mentioned in the agents' reports or the government's responses to the discovery requests. In his closing argument, defense counsel again challenged the veracity of Agent Ruiz's testimony, suggesting Nickens' alleged statement was probably fabricated because it is implausible that "an expert" would have omitted such a statement from his report. This strategy undercut Agent

---

The transactions in California will be presented to you only to show possible knowledge and intent to commit the present offense, and that is all. They are not presented to you to show bad character or a pattern of conduct or propensity to commit this type of crime.

Counsel on both sides expressed their satisfaction with this instruction in a bench conference with the judge. In its final instruction to the jury, the court repeated the same limiting instruction about the prior crimes evidence that it had given before. In addition the court instructed that

> [t]he prosecution had asked certain questions on cross-examination of the defendant's character witnesses as to the events in the defendant's past. Those questions were permitted for the sole purpose of testing the witnesses' knowledge of the defendant's reputation and

are to be considered by you only for the purpose of testing the credibility of the witnesses who have given character or reputation testimony about the defendant, and for no other purpose.

**9.** Rule 16(a)(1)(A) provides in pertinent part that

> Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph ... the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent....

Fed.R.Crim.P. 16(a)(1)(A).

Ruiz's testimony and seems likely to have reduced the impact of the statement. In any event, we see no abuse of discretion in the district court's refusing to grant Nickens' motion to dismiss on this ground.

F. *Privilege Against Self–Incrimination*

■ Nickens contends that his conviction on count III for violating 21 U.S.C. § 955 should be vacated because that statute violates his Fifth Amendment privilege against self-incrimination. As this challenge to section 955 is being raised for the first time on appeal, we review only for plain error. Fed.R.Crim.P. 52(b).

Section 955 provides that

[i]t shall be unlawful for any person to bring or possess on board any vessel or aircraft ... arriving in or departing from the United States or the customs territory of the United States, a controlled substance in schedule I or II ..., unless such substance ... is a part of the cargo entered in the manifest or part of the official supplies of the vessel [or aircraft].

21 U.S.C. § 955. Citing *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and its progeny, Nickens argues that section 955 is unconstitutional because it requires a person who has done or contemplates doing an act that renders him "inherently suspect of criminal activities" to disclose that act to the government. *Marchetti*, 390 U.S. at 47, 88 S.Ct. at 702. In this case, Nickens contends, complying with the requirements of section 955 would have made him "inherently suspect" of violating 21 U.S.C. § 952(a)—importation of cocaine, and 21 U.S.C. § 841(a)—possession of cocaine with intent to distribute. We find no merit in Nickens' contentions.

Nickens' reliance on *Marchetti* is misplaced. In that case, the United States Supreme Court held that the privilege against self-incrimination provided an absolute defense to a federal statute requiring those involved in wagering activities to register with the Internal Revenue Service. The Court held that because there were several federal and state laws prohibiting wagering activities, and because the information from registrants was widely available to prosecuting authorities, the registration requirements "would surely prove a significant 'link in a chain' of evidence tending to establish [a registrant's] guilt." *Marchetti*, 390 U.S. at 48, 88 S.Ct. at 703 (citation omitted); *see also Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). Moreover, the Court maintained that "[t]he central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary hazards of incrimination." *Id.* 390 U.S. at 53, 88 S.Ct. at 705. (citations omitted).

We find the statute in this case distinguishable from those in *Marchetti* and its progeny. In *Marchetti*, the person asserting the privilege against self-incrimination would have been required to report the incriminating evidence directly to the government. In contrast, section 955 requires an individual to report the cocaine to the airline so that it might be included as part of the cargo entered in its manifest. The statute at issue in this case is more like that in *Minor v. United States*, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969). In *Minor*, the Supreme Court upheld the constitutionality of the Marijuana Tax Act which required individuals selling narcotic drugs and marihuana to obtain a written order form from the buyer. The statute required that the buyer's order must be on the form issued by the Secretary of the Treasury and contain the name and address of both buyer and seller. *Minor*, 396 U.S. at 90, 90 S.Ct. at 285. The Court rejected the argument that this forces a seller to incriminate himself by requiring him to insist on an order linking him to an illicit transaction and forcing him to furnish the necessary links himself by providing his name and address. *Id.*, at 91, 90 S.Ct. at 286. The Court stated that "[t]he obligation to furnish the necessary information is in terms placed on the buyer; while his compliance with that obligation may 'inform' on the seller, it would not ordinarily be thought to result in the latter's 'self-

incrimination.'" *Id.* at 91 n. 3, 90 S.Ct. at 286 n. 3. Moreover, the Court found that there was "no real and substantial possibility that the [statute's] order form requirement will in any way incriminate sellers for the simple reason that sellers will seldom, if ever, be confronted with an unregistered purchaser who is willing and able to secure an order form." *Id.* at 93, 90 S.Ct. at 287. The Court distinguished *Marchetti* and its progeny stating that:

> The vice of the statute in [those cases] stemmed from the dilemma that confronted the buyer. The statute purported to make all purchases of marihuana legal from the buyer's viewpoint at his option; all he had to do to avoid the federal penalty was to secure the form and pay the tax. But to exercise that option and avoid the federal penalty, he was forced to incriminate himself under other laws. In the present case, the first horn of this dilemma does not confront the seller. In the face of a buyer's refusal to secure the order form, the option of making a legal sale under federal law is foreclosed by the buyer's decision, and "full and literal compliance" with the law by the seller means simply that he cannot sell at all. There is no real and substantial possibility that [the statute's] order form requirement will in any way incriminate sellers for the simple reason that sellers will seldom, if ever, be confronted with an unregistered purchaser who is willing and able to secure the order form.

*Id.* at 92–93, 90 S.Ct. at 286–287.

■ We find the analysis in *Minor* controlling in this case. Here as in *Minor*, the challenged statute requires the complaining party to report information to a third party, not directly to the government (as the statute in *Marchetti* required). More-over, a pilot, like the buyer in *Minor*, would be subject to prosecution if he were to comply with an unauthorized importer's request to transport cocaine as cargo entered in his aircraft's manifest.[10] Consequently, here as in *Minor*, there is "no real and substantial possibility" that section 955's reporting requirement will incriminate importers because it is unlikely that an importer will be confronted with a pilot who is willing to enter the cocaine in the cargo manifest or transport it. *Id.* at 93, 90 S.Ct. at 287. Accordingly, we find that the Fifth Amendment's privilege against self-incrimination does not provide an absolute defense to prosecution under 21 U.S.C. § 955.

## II. CONCLUSION

Nickens raises a number of other claims which we find without merit and which do not warrant detailed discussion.

*Affirmed.*

---

**10.** Pilots are required to submit the cargo manifest of their aircraft to the Customs Service upon arrival in the United States. *See* 19 U.S.C. 1431, 1433(d); 19 C.F.R. 122.48(a). A pilot who transports merchandise knowing that "the merchandise will be introduced into the United States contrary to law" could be subject to prosecution for aviation smuggling. 19 U.S.C. § 1590; 19 C.F.R. 122.167. Such a pilot might also be subject to prosecution for drug traffick-ing. The privilege against self-incrimination is not available to pilots in this context because the cargo manifest would fall within the "required records" doctrine. *See Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (holding that "essentially regulatory" recordkeeping may be required of private individuals without violating the Fifth Amendment privilege against self-incrimination).