STATE OF CONNECTICUT *v.* HARTLEY HINES
(SC 15309)

Callahan, C. J., and Berdon, Norcott, Katz and McDonald, Js.

---

Argued December 10, 1997—officially released March 3, 1998

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Mary H. Lesser*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, assistant state's attorney, for the appellee (state).

*Opinion*

CALLAHAN, C. J. The defendant, Hartley Hines, also known as Robert "Ricky" Harris, was charged in an information with murder in violation of General Statutes § 53a-54a, and criminal possession of a firearm in violation of General Statutes § 53a-217.[1] Following

---

[1] General Statutes § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

General Statutes § 53a-217 provides: "Criminal possession of a firearm or electronic defense weapon: Class D felony. (a) A person is guilty of criminal possession of a firearm or electronic defense weapon when he possesses a firearm or electronic defense weapon and has been convicted of a capital felony, a class A felony, except a conviction under section 53a-196a, a class B felony, except a conviction under section 53a-86, 53a-122 or 53a-196b, a class C felony, except a conviction under section 53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216. For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction.

"(b) Criminal possession of a firearm or electronic defense weapon is a class D felony, for which two years of the sentence imposed may not be suspended or reduced by the court."

judgments of conviction on both counts, he was sentenced to a term of fifty years incarceration on the murder charge and five years on the criminal possession charge, to be served consecutively. He appealed from both convictions to this court pursuant to General Statutes (Rev. to 1997) § 51-199 (b),[2] raising the following four issues: (1) whether the trial court properly admitted into evidence as a prior consistent statement, Mark Reid's statement to the police regarding a threat that the defendant had made to the victim; (2) whether the court correctly refused to admit Kenyan Smith's statement pursuant to the residual exception to the hearsay rule; (3) whether the court properly instructed the jury concerning consciousness of guilt; and (4) whether the court properly instructed the jury concerning reasonable doubt. None of the issues raised warrants reversal of the defendant's convictions.

A jury reasonably could have found the following facts. On June 23, 1993, at approximately 9:20 p.m., the victim, Worrell Johnson, also known as Gucci, was shot and killed in the area of Scranton Street and Sherman Street in New Haven. Earlier that day, Mark Reid and Marlon Brown were at the home of the victim when the victim received a telephone call, which he placed on the speaker phone.[3] Reid heard the conversation, recognized the defendant's voice and identified the defendant as the caller. During the call, the defendant

---

[2] General Statutes (Rev. to 1997) § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ." Public Acts 1997, No. 97-178, § 2, eliminated the right of direct appeal from all convictions except conviction of a capital felony, effective October 1, 1997.

[3] Brown testified that he did not recall hearing any threats and that Reid had not been present at the time of the telephone call. Reid testified that he had been present and had heard the threat.

and the victim argued over $500 owed by the defendant to the victim as a result of their drug transactions. The defendant threatened the victim, saying he would pay the $500, but that the victim should use the money to buy a suit for his own funeral.

Later that evening, Reid, Brown and the victim were on the corner of Whalley Avenue and Norton Street in New Haven when, at approximately 9 p.m., the defendant rode by the corner on a bicycle and threatened the victim. At some point between 9 and 9:20 p.m., the victim rode away on his own bicycle. He was not seen alive again by Reid or Brown. After his initial appearance at the corner, the defendant later returned twice as a passenger in a burgundy Subaru Legacy driven by Tyrone Ashby, also known as Dice. The first time, the defendant told Reid to tell the victim that he was "not playing" and not leaving his "steel," a slang term for a gun, on the street. The second time, he told Reid that he had just shot the victim and that he intended to leave to get more ammunition and would return to shoot a friend of the victim. Immediately thereafter, Reid and Brown were told by a bystander that the victim had been shot. When Reid went with Brown to the scene of the murder, he observed the defendant and Ashby drive by in Ashby's car.

While the defendant was in the car with Ashby, he had in his possession a .38 caliber handgun, which was the same caliber as the murder weapon. He also appeared to be intoxicated. When the defendant and Ashby drove past the scene of the shooting, the defendant admitted to Ashby that he had shot at the victim because he was "tired of being messed with" and in retaliation for the victim allegedly having shot at him the previous day. Additional relevant facts will be provided as necessary.

## I

The defendant first claims that the trial court improperly admitted a portion of a statement Reid made to the police, which was consistent with Reid's later trial testimony, regarding a telephone threat made to the victim on the morning of the murder. The defendant argues that because he neither offered a theory of recent fabrication[4] with respect to the threat nor attempted to impeach Reid's credibility regarding the telephone call, the court improperly admitted Reid's prior consistent statement concerning the threat. We disagree.

The trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). Moreover, evidentiary rulings "will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). This deferential standard is applicable to evidentiary questions involving hearsay,

---

[4] The defendant asserted that his theory was that Reid was lying on the stand and in his prior statement to the police.

generally; see *State* v. *Beliveau*, supra, 592; and to questions relating to prior consistent statements, specifically. See *State* v. *Valentine*, 240 Conn. 395, 413–14, 692 A.2d 727 (1997).

The defendant's evidentiary challenge stems from the combined trial testimony of two of the state's witnesses. Reid testified on direct examination that he was present when the victim received threats over the telephone on the morning of the murder. He also testified regarding the incidents involving the defendant at the corner of Whalley Avenue and Norton Street on the evening of the murder. On cross-examination, the defendant questioned Reid regarding portions of a statement he had made to the police shortly after the murder that were inconsistent with his trial testimony. Specifically, Reid was questioned regarding apparent inconsistencies between his testimony and his prior statement pertaining to events that occurred on the evening of the murder. In that connection, the defendant introduced only those portions of Reid's prior statement relating to the evening of the murder. He did not question Reid regarding his presence at the time of the threatening telephone call nor did he offer to introduce at that time the portion of Reid's statement pertaining to that incident. The trial court did permit the state, on redirect examination, to introduce additional portions of Reid's statement relating to events that had occurred on the evening of the murder that were consistent with Reid's trial testimony. Those portions of the statement were offered to rehabilitate Reid's credibility.

Brown, another state's witness, also testified concerning the events that had occurred on the evening of June 23, 1993, at the corner of Whalley Avenue and Norton Street. His testimony substantially corroborated Reid's testimony in that regard. On cross-examination, Brown testified that he had been present with the victim at the time the victim received the morning telephone

call from the defendant. He was unable, however, to testify to the full extent of the conversation. He did state that the conversation had been about money but that he could not recall any threats. Brown further testified that Reid was not present at the time of the telephone call. On redirect examination, Brown was more equivocal, vacillating between saying that Reid had not been there and that he could not remember whether Reid had been present. On recross-examination, Brown again said that Reid had not been present at the time of the telephone call. At that point, the state argued that Reid's prior statement regarding the telephone call was properly admissible to rehabilitate his credibility, which had been impeached by the combined effect of the cross-examinations of Reid and Brown and the admission of only a part of Reid's prior statement, which implied a recent fabrication of the testimony regarding the telephone call. The trial court agreed with the state's argument and admitted that portion of Reid's prior statement into evidence.[5] We conclude that the court did not abuse its discretion in doing so.

An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992). Prior consistent statements of a witness are generally regarded as hearsay and are not admissible at trial, either for their truth or for the purpose of rehabilitating a witness' damaged credibility. *State* v. *Valentine*, supra, 240 Conn. 412; *Thomas* v. *Ganezer*, 137 Conn. 415, 417, 78 A.2d 539 (1951). "The rationale upon

---

[5] We note that the trial court never expressly stated that it was admitting the statement for rehabilitative purposes owing to the implication of a recent fabrication. The trial court's commentary on the evidence with which it was concerned, as well as its reliance on the reasoning of *State* v. *Harris*, 10 Conn. App. 217, 522 A.2d 323 (1987), which is based, in relevant part, on the recent fabrication exception, lead us to conclude, however, that this was its basis for admitting Reid's prior statement.

which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it." (Internal quotation marks omitted.) *State* v. *Dolphin,* 178 Conn. 564, 569, 424 A.2d 266 (1979). "This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached by a prior inconsistent statement; see, e.g., *State* v. *McCarthy,* [179 Conn. 1, 18–21, 425 A.2d 924 (1979)]; by the suggestion of bias, motive, or interest arising after the time the prior consistent statement was made; see, e.g., *State* v. *Dolphin,* [supra, 571–72]; by a claim of recent fabrication; see, e.g., *State* v. *Pollitt,* [205 Conn. 61, 77, 530 A.2d 155 (1987)]; or by a claim of faulty memory; see, e.g., *State* v. *Anonymous (83-FG),* [190 Conn. 715, 729, 463 A.2d 533 (1983)]; see generally *State* v. *Brown,* [187 Conn. 602, 608, 447 A.2d 734 (1982)] (summary of rule and exceptions). When a prior consistent statement is admitted under any of these exceptions, it is admitted to affect credibility only and not to establish the truth of the statement. *State* v. *McCarthy,* supra, 18." *State* v. *Valentine,* supra, 413.

The state argues that Reid's entire statement was admissible because it had been offered only after Reid was impeached with a prior inconsistent statement and because a claim of recent fabrication implicitly had been made. We find both of the state's arguments persuasive. The state first argues that the defendant's cross-examination of Reid relating to only a part of his prior statement, coupled with the defendant's cross-examination of Brown regarding Reid's alleged absence at the time of the threatening telephone call on the morning of the murder, combined to leave the jury with the impression that Reid only recently had fabricated his testimony relating to the telephone call. The state maintains that it is irrelevant that the defendant did not expressly pursue a theory of recent fabrication. The

only relevant inquiry is whether the jury reasonably may have been left with the impression that Reid's testimony was a recent fabrication. We agree with the state.

Although we have not directly addressed this issue, we find the analysis and rationale of *Commonwealth v. Gore*, 262 Pa. Super. 540, 396 A.2d 1302 (1978), persuasive. There, the court concluded that "[i]t is not necessary that the impeachment be explicit, i.e., that an actual allegation of recent fabrication be made, but only that a jury be able to reasonably infer that such is occurring." Id., 550. In *Gore*, the victim of a sexual assault identified the defendant as her attacker. On cross-examination, the defendant's attorney inquired whether the victim had ever seen the defendant prior to the assault. The victim related that she had seen him some five months before the assault when he had helped her bring groceries into her house. At that time, she recalled having commented that she hoped he was not the type to rape her. In his opening statement and through testimony adduced at trial, the defendant raised an alibi defense. From the cross-examination of the victim regarding her prior knowledge of the defendant, combined with the alibi defense, the court concluded that the implication *might* have been that the victim identified this defendant only because he was "a convenient and identifiable attacker." Id., 551. The court noted that "[a]lthough this was not made explicit, the jury could infer it from the questioning and the forthcoming alibi defense . . . . While it is a close question as to whether there was indeed a reasonable inference of a recent fabrication . . . we find that the trial judge did not abuse his discretion . . . ." (Citation omitted.) Id.; see also *State v. Dictado*, 102 Wash. 2d 277, 290, 687 P.2d 172 (1984) (concluding there was implicit theory of recent fabrication because "inferences raised in cross examination

were sufficient to allow counsel to argue that [the witness] had reason to fabricate his story"); *United States v. Patterson*, 644 F.2d 890, 900 (1st Cir. 1981) ("[t]he jury could have thought it was being suggested that [the defendant's] testimony was recently fabricated or improperly influenced").

When a trial court reasonably can conclude that there was sufficient evidence to permit a jury to draw an inference of recent fabrication, it may admit a prior consistent statement for rehabilitative purposes. It is irrelevant that a specific argument claiming recent fabrication has not been made. In this case, the trial court's conclusion that the combined effect of the cross-examinations of Brown and Reid created a possible inference of recent fabrication was reasonable. The defendant's cross-examination of Brown was directed specifically at proving that Reid had lied when he claimed to have been present at the time of the threatening call. Additionally, the introduction of the parts of Reid's statement containing information regarding only the evening of the murder might well have left the impression with the jury that the statement made no mention of the telephone call. The jury, therefore, reasonably might have concluded that Reid's testimony regarding the telephone call was recently fabricated. Accordingly, we cannot say that the trial court abused its discretion by admitting Reid's prior consistent statement regarding the telephone call that the victim received on the morning of the murder.

Although we conclude that the trial court's reason for admitting Reid's prior consistent statement relating to the threat was appropriate, we also address the state's alternative argument. The state asserts that the prior consistent statement regarding the threatening call is an integral part of Reid's entire statement, only part of which was used by the defendant to impeach Reid's credibility. The state claims that Reid's entire

statement properly should have been admitted to reha-bilitate Reid, including his recounting of events of both the evening of the murder and the threatening telephone call. See *State* v. *McCarthy*, supra, 179 Conn. 18–21. We agree. Admission of the entire statement allows the inconsistent portions of the statement to be placed into context and prevents misleading the jury. It precludes selective admission by one party that serves only to distort reality and allow legal technicalities to obfuscate the truth, thus undermining the jury's fundamental pur-pose. See *Gaulton* v. *Reno Paint & Wallpaper Co.*, 177 Conn. 121, 127, 412 A.2d 311 (1979) ("[i]t is undisputed that the function of the jury is to find the facts and that in so doing, the jury must apply to the evidence before them the rules of law provided by the court in its charge"); *Kast* v. *Turley*, 111 Conn. 253, 258, 149 A. 673 (1930) (court instructs on law "to assist the jury in so applying the law to the facts as they find them to be as to lead to an intelligent and correct conclusion"); 47 Am. Jur. 2d, Jury §§ 2, 15 (1995).

We have not specifically addressed this issue, but the Appellate Court has adopted this rationale. It has concluded on several occasions that a prior statement, portions of which have been used for impeachment purposes, is properly admissible in its entirety because "[t]he trial court . . . has the discretion to allow into evidence consistent portions of a statement from which inconsistencies have been offered by the defense, for purposes of rehabilitation, to place inconsistencies in context so as not to mislead the jury." *State* v. *Reddick*, 15 Conn. App. 342, 349, 545 A.2d 1109, cert. denied, 209 Conn. 819, 551 A.2d 758 (1988); accord *State* v. *Apostle*, 8 Conn. App. 216, 244–45, 512 A.2d 947 (1986); *State* v. *Cardona*, 6 Conn. App. 124, 130, 504 A.2d 1061 (1986). We find this rationale to be persuasive. When a party has impeached a witness with portions of a statement that are inconsistent with his or her trial testimony, the

trial court may, in its sound discretion, admit the entire statement for rehabilitative purposes, in order to place the allegedly inconsistent statement into context and to prevent the jury from being misled.

In summary, the defendant has not demonstrated that the trial court abused its discretion. The court reasonably could have concluded that Reid's prior consistent statement regarding the telephone threat was admissible for rehabilitative purposes[6] in light of the possibility that the jury might otherwise draw an inference of recent fabrication of his trial testimony on that subject. Alternatively, admission of the entire statement was permissible to prevent the jury from being misled by an incomplete picture of the facts. In either circumstance, admission of the prior consistent statement regarding the telephone call was proper.

II

The defendant next contends that the trial court improperly refused to admit the hearsay testimony of an unavailable witness pursuant to the residual exception to the hearsay rule. The following additional facts are relevant to this issue. The defendant sought to admit a statement that had been given by Kenyan Smith to the police six days after the murder.[7] The state concedes

---

[6] The trial court instructed the jury at the time the evidence was offered that it was to use the prior consistent statement solely for the purpose of evaluating Reid's credibility, i.e., for rehabilitative purposes, and not for its substance. "[J]urors are presumed to follow the instructions given by the judge." (Internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 441, 630 A.2d 1043 (1993). The defendant has presented no evidence to overcome this presumption.

[7] The substance of the statement was that Smith had spoken with the defendant just minutes before the shooting and had seen the victim across the street. He claimed that the defendant was calm when he spoke with him, that the defendant moved away after their conversation ended, that the defendant and the victim exchanged words initiated by the victim, that two shots were fired, that both the defendant and the victim walked away from the scene, and that he did not see any weapons. Smith did not, however, see the actual shooting.

that Smith was unavailable to testify because he was evading a material witness warrant and could not be located despite diligent efforts. The trial court concluded, however, that Smith's statement lacked sufficient indicia of reliability and refused to admit it under the residual exception. We review the court's evidentiary ruling to determine whether it was an abuse of discretion that resulted in substantial prejudice to the defendant. *State* v. *Beliveau*, supra, 237 Conn. 592; *State* v. *Colton*, supra, 227 Conn. 260; *State* v. *Alvarez*, supra, 216 Conn. 306.

The requirements for admission of a hearsay statement under the residual exception are set forth in *State* v. *Sharpe*, 195 Conn. 651, 491 A.2d 345 (1985). In *Sharpe*, we established a two-pronged test requiring (1) that admission of the statement must be a "reasonable necessity" and (2) that the statement itself must be "supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions." Id., 664; *State* v. *Oquendo*, supra, 223 Conn. 664. The first prong of the test, necessity, "is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or otherwise unavailable, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." *State* v. *Sharpe*, supra, 665, citing 5 J. Wigmore, Evidence (Chadbourne Rev. 1974) § 1421. It is undisputed that Smith was unavailable to testify. His evasion of a warrant and the inability of either party to procure his presence in court, despite diligent efforts to do so, was sufficient to establish unavailability. *State* v. *Lopez*, 239 Conn. 56, 77, 681 A.2d 950 (1996) ("[a] proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence"); *State* v. *Frye*, 182 Conn. 476, 481, 438 A.2d 735 (1980). Also,

Smith is the only witness who could have testified to the substance of the information contained in his statement. That fact, coupled with his unavailability, satisfies the requirement of necessity.

The second prong, reliability, is met "in a variety of situations," one of which is when " 'the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed.' " *State* v. *Sharpe*, supra, 195 Conn. 665. At minimum, the statement must "independently bear adequate indicia of reliability to afford the trier of fact a satisfactory basis for evaluating [its] truth . . . ." *State* v. *Williams*, 231 Conn. 235, 249, 645 A.2d 999 (1994); accord *State* v. *Lapointe*, 237 Conn. 694, 737, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). The hearsay statement that was admitted in *Sharpe* was deemed sufficiently reliable to be admitted because the declarant was disinterested and previously had been subjected to cross-examination on the substance of the statement.[8]

By contrast, Smith's statement possessed none of the common indicia of reliability. The court's decision to exclude the statement rested on several factors. Smith was a friend of the defendant and thus not a disinterested witness. Further, Smith waited until six days after the shooting to contact the police and give the statement in question, leaving ample time to fabricate. Moreover, Smith was evading a warrant mandating that he appear

---

[8] The witness in *Sharpe*, who was also the declarant, was a neighbor who observed suspicious activity, took note of a license plate and contacted the police after hearing about the crime charged. At trial, the witness could not remember the license plate number he had written down. The court allowed the police officer to testify to the number that the witness had given by using the report in which the call and information were recorded. The witness was on the stand to be cross-examined regarding the statement he had given to the police and was disinterested.

at the trial and testify. Finally, Smith had not been subject to cross-examination and, for all intents and purposes, never would be. Smith's statement, therefore, lacks any, let alone adequate, indicia of reliability. Consequently, we cannot say that exclusion of his statement by the trial court was an abuse of discretion.[9]

## III

In the defendant's third claim, he argues that the trial court improperly instructed the jury on the issue of flight as evidence of consciousness of guilt.[10] The following additional facts, which the jury reasonably could have found, are relevant to this claim. The defendant, knowing he was implicated in the death of the victim, left Connecticut immediately thereafter. Subsequently, he severed all contact with his parole officer, a contact

[9] The defendant argues that the trial court, nonetheless, should have admitted the statement "in the interests of justice"; *State* v. *Sharpe,* supra, 195 Conn. 666; because Smith is the closest there is to an eyewitness and the only one who can testify to the facts in his statement. See footnote 7 of this opinion. Even if, as the defendant argues, Smith's statement was the only evidence of its type and was necessary to the defendant's case, that is an insufficient basis for admission. "The interest of justice" is not an overriding test, separate and distinct from the two-pronged necessity/reliability test established in *Sharpe.* It is merely the final quaere of a trial court in deciding whether the two-pronged test is satisfied. The ability to meet one prong, even overwhelming, does not allow admission if the other prong cannot be met. "Even after the declarant is satisfactorily shown to be unavailable, his statement is admissible *only* if it bears adequate indicia of reliability." (Emphasis added; internal quotation marks omitted.) *State* v. *Outlaw,* 216 Conn. 492, 505, 582 A.2d 751 (1990), quoting *Ohio* v. *Roberts,* 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). It cannot be said that the interests of justice would be served by admission of an unreliable statement of an interested witness who secreted himself to avoid cross-examination.

[10] The trial court instructed the jury: "Flight, when unexplained, can indicate consciousness of guilt if the facts and the circumstances support it. If you find that the defendant did flee or did hide from the police following the commission of the crimes alleged, you may find that such actions tend to show a consciousness of guilt and you may use that flight and that hiding as evidence, along with all the other evidence in the case in determining whether the defendant has been proven guilty."

which previously had consisted of regular weekly meetings.[11] Moreover, the defendant called the police on June 29, 1993, from an unknown location and gave a telephone interview regarding his involvement in the shooting, and, although the police requested that he turn himself in at that time, he never complied. Furthermore, the defendant was using an assumed name when he was arrested in Philadelphia on April 20, 1994, on a fugitive warrant from Connecticut and, at that time, he gave false and conflicting statements to the Philadelphia police. The defendant also attempted to obliterate his fingerprints after the arrest to avoid identification.

The defendant requested that the court charge the jury with respect to flight. His request to charge included an instruction that there are many inferences that can be drawn from flight that are consistent with innocence.[12] The court declined to give the defendant's requested instruction and the defendant took a timely exception. The claim is, therefore, properly preserved. The defendant argues that the failure of the court to include his requested instruction regarding possible innocent explanations for flight in its charge requires reversal. We are unpersuaded.

The issue of jury instructions relating to a defendant's flight as consciousness of guilt was addressed in *State v. Wright*, 198 Conn. 273, 502 A.2d 911 (1986).[13] There,

---

[11] The last scheduled meeting that the defendant kept was on June 22, 1993, the day before the murder. The defendant missed his first scheduled meeting with his parole officer after the shooting, and every meeting thereafter, notwithstanding the parole officer's repeated attempts to reestablish contact.

[12] The requested instruction also included examples of innocent explanations. It read: "Flight may be motivated by a variety of factors which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness."

[13] The defendant attempts to distinguish *Wright*, arguing that it was a fact-specific decision that is not binding under the facts of this case. We find no such limitation in the decision and conclude that the cases are not materially distinguishable.

we concluded that an instruction which did not include "all the possible innocent explanations for his flight"; id., 280; was not erroneous and that "[t]he [trial] court was not required to enumerate all the possible innocent explanations offered by the defendant. The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous." Id., 281. In *State* v. *Freeney*, 228 Conn. 582, 594, 637 A.2d 1088 (1994), this court affirmed its conclusion in *Wright*. See also *State* v. *Groomes*, 232 Conn. 455, 472–73, 656 A.2d 646 (1995). We further concluded in *Freeney* that an instruction was not improper for failure of the trial court to convey an innocent explanation for flight that was actually presented by the defendant. Unlike the defendant in *Freeney*, the defendant here produced no evidence supporting any innocent explanation for his flight. An instruction relating to other explanations would, therefore, be unsupported by the evidence. We previously have stated, in such situations, that when "the defendant did not testify or offer any independent evidence of other explanations for his flight . . . [t]he court was not required to supply to the jury possible innocent explanations that the defendant himself had not offered. Indeed, even when there is such evidence, we have held that, although the trial court may, it is not required to 'enumerate all the possible innocent explanations offered by the defendant.' " *State* v. *Groomes*, supra, 473.

The defendant acknowledges the strong precedent against his position, but urges this court to overrule that precedent. We have repeatedly rejected this invitation, and the defendant has presented no additional persuasive reason why we should not reject his claim. The trial court's instruction on flight was virtually identical to that upheld in *Freeney*.[14] As in *Freeney*, the

[14] In *Freeney*, the trial court instructed the jury that " '[f]light, when unexplained, can indicate consciousness of guilt if the facts and the circumstances

court here began its instruction by noting that " [f]light, *when unexplained,* can indicate consciousness of guilt . . . ." (Emphasis added.) This was a sufficient reminder to the jury that there may be other, less culpable explanations for flight.

Finally, the defendant requests, notwithstanding the absence of a constitutional violation, that we invoke our supervisory powers to promulgate a rule precluding any jury instruction on flight that does not include possible innocent explanations. He argues that the significance of flight is best left to oral argument and that jury instructions are unnecessary and serve only to highlight unfairly an inference in favor of the prosecution. We disagree. Invocation of our supervisory powers would not benefit this defendant. In exercising our supervisory powers "we have frequently given only prospective effect to changes based strictly on policy considerations that do not carry constitutional implications. See, e.g., *Bennett* v. *Automobile Ins. Co. of Hartford,* 230 Conn. 795, 806, 646 A.2d 806 (1994); *State* v. *Patterson,* 230 Conn. 385, 397, 645 A.2d 535 (1994); *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Vilalastra,* 207 Conn. 35, 40, 540 A.2d 42 (1988)." *State* v. *Troupe,* 237 Conn. 284, 305, 677 A.2d 917 (1996).

More importantly, however, we do not consider this an appropriate case for the exercise of our supervisory powers. See Practice Book § 4183. " '[O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle.' " *State* v. *Pouncey,* 241 Conn.

support it. Flight may be proven by efforts of the police to locate the defendant, that proof must be supported by either direct or inferential evidence that the defendant knew he was wanted by the police. Evidence that members of the defendant's family knew he was being sought or that he failed to report to work following the alleged crimes have been found sufficient to infer flight by the defendant.' " *State* v. *Freeney,* supra, 228 Conn. 593.

802, 813, 699 A.2d 901 (1997). Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless "of 'utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole.' " *State* v. *Holloway,* supra, 209 Conn. 645. In this context, the supervisory powers serve a narrow purpose. "In each case in which we have invoked our supervisory authority, we have acted to provide additional procedural safeguards for some salient aspect of the right to a trial before an impartial jury. See *State* v. *Breton,* [235 Conn. 206, 250, 663 A.2d 1026 (1995)] (special jury verdict form in death penalty cases); *State* v. *Jones,* 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (bifurcation of jury proceedings in some death penalty cases); *State* v. *Patterson,* supra, 230 Conn. 397–98 (personal judicial supervision of voir dire); *State* v. *Holloway,* supra, 645–46 (judicial inquiry into bias claims at voir dire)." *State* v. *Brown,* 235 Conn. 502, 528, 668 A.2d 1288 (1995). Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance where these traditional protections are inadequate to ensure the fair and just administration of the courts. See *State* v. *Patterson,* supra, 397–98; *State* v. *Holloway,* supra, 645–46.

A blanket rule governing flight instructions would not serve the narrow purpose that our supervisory powers are intended to further. The flight instruction given did not foreclose this defendant's right to a trial by an impartial jury, nor is such an instruction likely to do so in the future. As we have stated previously, flight,

in the absence of an explanation, is circumstantial evidence that may tend to prove consciousness of guilt. *State* v. *Freeney*, supra, 228 Conn. 593. It is appropriate for the jury to hear such circumstantial evidence and for the trial court to comment upon it. *Laukaitis* v. *Klikna*, 104 Conn. 355, 360, 132 A. 913 (1926) ("it is [the judge's] duty to inform the jury what the law is as applicable to the facts of the case" [internal quotation marks omitted]); *State* v. *Wolff*, 29 Conn. App. 524, 525, 616 A.2d 1143 (1992); *Jacques* v. *Carter*, 2 Conn. App. 27, 34, 476 A.2d 621 (1984). The decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court. The trial court did not abuse its discretion in giving the jury its instruction regarding flight as evidence of consciousness of guilt.

IV

The defendant finally argues that the trial court's instruction on reasonable doubt was improper. Notwithstanding our precedent to the contrary, he contends that an instruction that "reasonable doubt is a real doubt, an honest doubt," and is not "doubt which is raised by the ingenuity of counsel or by a juror and unwarranted by the evidence" deprived him of his constitutional rights to effective assistance of counsel and to present a defense, and impermissibly reduced the state's burden of proof. We are unpersuaded.

The defendant did not request a charge on reasonable doubt, and he also failed to object to the reasonable doubt instruction given by the trial court. He seeks review, however, pursuant to *State* v. *Golding*, 213 Conn. 233, 239, 567 A.2d 823 (1989), or the doctrine of plain error. We recently have revisited the limitations on the right to review under *Golding* of an unpreserved claim with respect to a jury instruction challenge. In *State* v. *Dash*, 242 Conn. 143, 151, 698 A.2d 297 (1997),

we stated: "The defendant concedes that he neither filed a request to charge nor excepted to the jury instruction that he now maintains was improper. He therefore seeks review of his unpreserved claim under *State* v. *Golding*, [supra, 239–40] wherein we held that 'a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail.' . . . Although the record before us is adequate to review the defendant's claim, the defendant has failed to meet the second prong of the *Golding* test because his claim of instructional impropriety is not one of constitutional magnitude. 'Just as every claim of evidentiary error by the trial court is not truly constitutional in nature; see, e.g., id., 241; every claim of instructional error is not truly constitutional in nature. . . . Indeed, it would trivialize the constitution to transmute a non-constitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right.' " (Citations omitted; emphasis in original.) *State* v. *Dash*, supra, 151–52.

As recently as *State* v. *Taylor*, 239 Conn. 481, 504–505, 687 A.2d 489 (1996), this court rejected the defendant's challenge to the language complained of by the defendant as a constitutional violation under *Golding* or as plain error.[15] We determined that the instruction in *Taylor*, which was virtually identical in all relevant respects

[15] In *Taylor* we noted that the "ingenuity of counsel" language, taken alone, might be problematic, and we suggested that it ought to be avoided

to that at issue here,[16] did not violate the defendant's constitutional rights to present a defense or to assistance of counsel, nor did it reduce the state's burden. We concluded, therefore, that the defendant could not prevail under *Golding*. The result in this case is governed by *Taylor*. See also *State* v. *Small*, 242 Conn. 93, 113–15, 700 A.2d 617 (1997). The defendant's only argument is that we should overrule established precedent. We are unpersuaded by his argument that we should do so.[17]

"It is well settled that a jury instruction is to be examined in its entirety, and that the test to be applied is whether the charge as a whole presents the case to

in the future. We do not retract that recommendation. It cannot even be argued, however, that the trial court ignored our admonition to avoid this language since the instructions in the present case were given at least one year prior to publication of the *Taylor* decision.

[16] In *Taylor*, the trial court's full instruction regarding reasonable doubt was as follows: " 'Now, what does that mean, beyond a reasonable doubt. The phrase reasonable doubt has no technical or unusual meaning. We can arrive at the real meaning of the phrase by emphasizing the word reasonable. A reasonable doubt is a doubt which is something more than a guess or surmise. It is not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts, *nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or by the lack of evidence.* A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence. It is a doubt for which you can in your own mind conscientiously give a reason. A reasonable doubt, in other words, is *a real doubt, an honest doubt,* a doubt which has its foundation in the evidence or lack of evidence. It is the kind of doubt which in the serious affairs of everyday life which concerns us all, we would pay heed and attention to. It is the kind of doubt which would make a reasonable person hesitate to act.' " (Emphasis added.) *State* v. *Taylor*, supra, 239 Conn. 504 n.12.

[17] The defendant directs us to *United States* v. *Doyle*, 130 F.3d 523 (2d Cir. 1997), a case recently decided by the Court of Appeals for the Second Circuit addressing jury instructions on reasonable doubt. While that case is insightful and informative, it is of no bearing on this case. The instruction invalidated in *Doyle*, that the law is designed to protect the innocent, not the guilty, is wholly unrelated to the instruction at issue. The court in *Doyle* concluded that the instruction, in its entirety, misstated the law. Id., 533. That is not the case here.

the jury so that no injustice will be done. *State* v. *Derrico*, 181 Conn. 151, 170, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)." *State* v. *Lytell*, 206 Conn. 657, 664, 539 A.2d 133 (1988); see also *State* v. *Findlay*, 198 Conn. 328, 346–47, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986). The jury instruction in this case, viewed as a whole, adequately instructed the jury concerning reasonable doubt.[18] The instruction clearly informed the jury that the burden to prove the defendant's guilt beyond a reasonable doubt rested entirely on the state at all times. Specifically, the instruction advised the jury that "the evidence must be so sufficient that it would leave no room in your minds for any reasonable hypothesis of the innocence of the accused . . . [and it] must exclude every reasonable supposition of innocence . . . ." The instruction described the

---

[18] Unlike the dissent, we cannot view these terms in isolation. The dissent fails to note that the phrase "ingenuity of counsel" is immediately succeeded by the phrase "or by a juror and unwarranted by the evidence." Such language does indicate to the jury that doubt may not be created by an argument of counsel or other jurors that is ingenious, but has no basis in the evidence. It is an accurate statement of the law to say that all findings of fact must be supported by the evidence. See, e.g., *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 65, 699 A.2d 101 (1997).

Additionally, the dissent cites to cases that have disapproved of instructions that equate a reasonable doubt to "grave uncertainty," "an actual substantial doubt," "a moral certainty." See footnote 4 of the dissenting opinion. We do not disagree that those instructions may be improper. Other than "a," "an," and "doubt," however, not a single one of the terms disapproved of in those cases appears in the jury instruction at issue here. We, unlike the dissent, cannot conclude that the phrase "real doubt" is the equivalent of "substantial doubt." The dissent's conclusion that one definition of "real" is " 'not illusory: indubitable, unquestionable,' " and " 'not merely verbal or formal: significant' " and that this definition is essentially the same as "substantial" is not persuasive. See pages 824–25 of the dissenting opinion; Webster's Third New International Dictionary. This linguistic extrapolation by the dissent cannot be imputed to the jury. This is especially true in this case in light of the juxtaposition of the phrase "an honest doubt" to "a real doubt," which indicates that the connotation of "real" comports with its most common definition as "authentic, genuine . . . not merely apparent: actual, true." Webster's Third New International Dictionary.

concept of reasonableness by noting that "reasonable doubt is a doubt which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and more important matters relating to your own affairs." In explaining the concept of proof beyond a reasonable doubt, the instruction directed that it "is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion." This language, taken as a whole, was adequate to apprise the jury of the heavy burden on the state and the defendant's presumption of innocence.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and MCDONALD, Js., concurred.

BERDON, J., dissenting. I would reverse the defendant Hartley Hines' conviction based upon the trial court's incorrect instructions on the burden of proof, which violated his federal constitutional right that guilt be proven beyond a reasonable doubt and his right to counsel. I focus on two instructions given to the jury in this case in the context of explaining the state's burden of proof as follows: "A reasonable doubt is not a capricious or a frivolous doubt, *nor is it a doubt which is raised by the ingenuity of counsel* or by a juror and unwarranted by the evidence, nor is it a doubt prompted by sympathy for the defendant. A reasonable doubt is *a real doubt,* an honest doubt, a doubt which has its foundation in the evidence offered in the case or the lack of evidence."[1] (Emphasis added.)

---

[1] The trial court's entire instruction on reasonable doubt in this case was as follows: "The burden of proving his guilt beyond a reasonable doubt requires the state to produce sufficient evidence to create in your minds a strong and abiding conviction of the guilt of the defendant. In other words, it is the law that the evidence must be so sufficient that it would leave no room in your minds for any reasonable hypothesis of the innocence of the accused. Proof of guilt beyond a reasonable doubt must exclude every reasonable supposition of innocence, but it need not exclude every possible

The defendant did not object to these instructions at the time of trial and I can fully understand the reason why he neglected to do so. Although we do not have official pattern instructions, in one unofficial treatise on jury instructions both of those definitions are recommended with respect to the reasonable doubt instructions. D. Borden & L. Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (1986) § 2.9. Furthermore, our appellate courts have continuously rejected these claims.[2] Nevertheless, the defendant argues on appeal that these jury instructions implicate his constitutional right that guilt be proven beyond a reasonable doubt and his right to counsel, and, therefore, they are reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or under the "plain error"

supposition of innocence. A reasonable doubt is not a doubt raised by one who questions for the sake of raising a doubt. A reasonable doubt is not a surmise, or speculation, or conjecture, or an imaginary doubt. A reasonable doubt is not a capricious or a frivolous doubt, nor is it a doubt which is raised by the ingenuity of counsel or by a juror and unwarranted by the evidence, nor is it a doubt prompted by sympathy for the defendant. A reasonable doubt is a real doubt, an honest doubt, a doubt which has its foundation in the evidence offered in the case or the lack of evidence.

"Absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty to authorize a conviction. What it does require is that the guilt be established as charged beyond a reasonable doubt which is one founded upon the evidence or lack of evidence. A reasonable doubt is a doubt which would cause you as reasonable and prudent men and women to hesitate to act in the more weighty and important matters relating to your own affairs. Proof beyond a reasonable doubt is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion."

[2] See, e.g., *State* v. *Small*, 242 Conn. 93, 113–15, 700 A.2d 617 (1997); *State* v. *Taylor*, 239 Conn. 481, 504–505, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1977); *State* v. *Findlay*, 198 Conn. 328, 345–48, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986); *State* v. *Lopez*, 37 Conn. App. 509, 513–15, 657 A.2d 647, cert. denied, 234 Conn. 902, 660 A.2d 858 (1995); *State* v. *Payne*, 31 Conn. App. 370, 379–80, 625 A.2d 231, cert. denied, 227 Conn. 901, 630 A.2d 73 (1993); *State* v. *Harvey*, 27 Conn. App. 171, 192–94, 605 A.2d 563, cert. denied, 222 Conn. 907, 608 A.2d 693 (1992); *State* v. *Lamme*, 19 Conn. App. 594, 607, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990).

rule of Practice Book § 4061. See *State* v. *Findlay*, 198 Conn. 328, 345, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986). I agree with the defendant.

In order to put in proper perspective the requirement of proving a defendant's guilt in a criminal case beyond a reasonable doubt, I commence with a review of the "vital role [it plays] in the American scheme of criminal procedure." *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The United States Supreme Court explained that "[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder [beyond a reasonable doubt] of his guilt." (Internal quotation marks omitted.) Id., 364; see also *Jackson* v. *Virginia*, 443 U.S. 307, 313–16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (proof beyond reasonable doubt must be established for every element of crime charged). This requirement "dates at least from our early years as a Nation"; *In re Winship* supra, 361; and "is a prime instrument for reducing the risk of convictions resting on factual error." Id., 363. "Our democracy rests in no small part on our faith in the ability of the criminal justice system to separate those who are guilty from those who are not. This is a faith which springs fundamentally from the requirement that unless guilt is established beyond all reasonable doubt, the accused shall go free." *Victor* v. *Nebraska*, 511 U.S. 1, 28, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994) (Blackmun, J., concurring and dissenting).

"Because our system entrusts the jury with the primary responsibility of implementing the substantive protections promised by the reasonable doubt standard, reasonable doubt jury instructions which appropriately convey [*In re Winship*] concepts are critical to the constitutionality of a conviction. See, e.g., *Cage* v. *Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339

(1990)." *United States* v. *Doyle*, 130 F.3d 523, 535 (2d Cir. 1997). "To be a meaningful safeguard, the reasonable-doubt standard must have a tangible meaning that is capable of being understood by those who are required to apply it. It must be stated accurately and with the precision owed to those whose liberty or life is at risk. Because of the extraordinarily high stakes in criminal trials, [i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Victor* v. *Nebraska*, supra, 511 U.S. 29 (Blackmun, J., concurring and dissenting).

In *United States* v. *Doyle*, supra, 130 F.3d 533, the Second Circuit Court of Appeals held that the instruction "you must keep in mind that those rules of law [presumption of innocence and proving guilt beyond a reasonable doubt] are designed to protect the innocent and not the guilty"—violated the defendant's federal constitutional right. What the Second Circuit stated in *Doyle*, with respect to the presumption of innocence and guilt beyond a reasonable doubt as they relate to the jury instruction that those rules are designed to protect the innocent and not the guilty, is equally applicable to this case. "A natural inclination of some jurors may be to assume that, because the defendant has been selected for prosecution, he must be guilty. One of the greatest responsibilities of the trial judge is her duty to overcome that inclination by impressing upon the jury the importance of the presumption of innocence and of the Government's burden to prove guilt beyond a reasonable doubt. See *Holbrook* v. *Flynn*, 475 U.S. 560, 567–68, 106 S. Ct. 1340, 1345, 89 L. Ed. 2d 525 (1986) (both defense counsel and the trial judge have the responsibility diligently to impress upon jurors [t]he need to presume the defendant's innocence); [*United States* v. *Birbal*, 62 F.3d 456, 462–63 (2d Cir. 1995)] (Since [*In re Winship*], few elements of due process

have been clearer than the necessity of informing the jury that, to convict, it must find each defendant guilty beyond a reasonable doubt of every element charged.). . . . In order to reduce [the risk of factual error and unjust convictions] . . . the jurors must be made to see that the case against the defendant begins as a tabula rasa, a slate upon which may be written only such marks as derive from the evidence admitted at trial." (Citations omitted; internal quotation marks omitted.) *United States* v. *Doyle*, supra, 538–39.

The Second Circuit Court of Appeals went on to explain in *Doyle* that "[u]nless and until the Government meets its burden of proof beyond a reasonable doubt, the presumption of innocence remains with the accused regardless of the fact that he has been charged with the crime, regardless of what is said about him at trial, regardless of whether the jurors believe that he is likely guilty, regardless of whether he is actually guilty. The presumption attaches to those who are actually innocent and to those who are actually guilty alike throughout all stages of the trial and deliberations unless and until that burden is met. A jury charge which implies otherwise creates a serious risk of undermining that vital protection." Id., 539.

First, in my view the trial court's reference in the present case to "a reasonable doubt is a real doubt," impermissibly dilutes the requirement that the state prove its case beyond a reasonable doubt, and cannot pass constitutional muster. Both a common understanding and a dictionary definition of "real" is "not illusory: indubitable, unquestionable" and "not merely verbal or formal: significant," which is, in essence, "substantial"; Webster's Third New International Dictionary (1986); or, at the very least, a "high likelihood." *United States* v. *Nickens*, 955 F.2d 112, 120 n.4 (1st Cir.), cert. denied, 506 U.S. 835, 113 S. Ct. 108, 121 L. Ed. 2d 66 (1992). In other words, the jury could reasonably have concluded

from the instructions in this case that a real doubt is one which is either a substantial doubt or a high likelihood of doubt. In *Cage,* the Supreme Court of the United States summarily reversed a conviction in which the trial court equated reasonable doubt to a "substantial doubt," holding that "substantial" as "commonly understood, suggest[s] a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." *Cage* v. *Louisiana,* supra, 498 U.S. 41;[3] see *Victor* v. *Nebraska,* supra, 511 U.S. 5–6; *Sullivan* v. *Louisiana,* 508 U.S. 275, 278, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). Justice Marshall, in *Adams* v. *South Carolina,* 464 U.S. 1023, 1025, 104 S. Ct. 558, 78 L. Ed. 2d 730 (1983) (joined by Brennan, J., dissenting from denial of certiorari), cogently pointed out that "[w]hen a criminal defendant is convicted by proof beyond a strong or substantial doubt, that defendant has not been afforded the full protections of the Federal Constitution. Moreover, when a jury is told that a reasonable doubt is a doubt that can be articulated, the prosecutor's burden of proof is unconstitutionally eased."[4] That is why federal appellate courts have uniformly criticized jury instructions that define reasonable doubt as " 'a substantial doubt, a real doubt.' " *Taylor* v. *Kentucky,* 436 U.S. 478, 488, 98 S. Ct. 1930, 56 L. Ed. 2d 468.[5]

---

[3] In *Cage,* the Supreme Court found objectionable the following references in the trial court's reasonable doubt instruction: " 'It must be such doubt as would give rise to a grave uncertainty,' " " '[i]t is an actual substantial doubt,' " and " 'a moral certainty.' " *Cage* v. *Louisiana,* supra, 498 U.S. 40.

[4] " " "Reasonable" and "substantial" are not synonymous, as can be seen by referring to any of the standard dictionaries [or by considering the following hypothetical]. . . . [I]f one had to undergo a serious operation and were querying the doctor as to the prospects for a successful outcome, how differently [would the person feel] if the doctor told him there was only a reasonable chance of success as opposed to being told there was a substantial chance of success[?]' " *United States* v. *Atkins,* 487 F.2d 257, 260 n.2 (8th Cir. 1973), quoting *State* v. *Davis,* 482 S.W.2d 486, 490 (Mo. 1972) (Seiler, J., concurring in result).

[5] Most of the federal appellate circuits have criticized jury instructions that define reasonable doubt as a substantial doubt. See, e.g., *United States*

The First Circuit Court of Appeals has explained that "equating reasonable doubt with a real doubt reduces the government's burden [of proof] because in common parlance, to have a 'real doubt' is to think there is a high likelihood of error. To find a reasonable doubt, however, such a likelihood of error is not required." *United States* v. *Nickens*, supra, 955 F.2d 120 n.4. In this case, the instruction that the doubt of innocence of the accused must be "real" or "substantial" dilutes the presumption of innocence no less than an instruction that the law is meant to protect the innocent and not the guilty. The threshold of the reasonable doubt standard is impermissibly raised beyond that which is allowed by *In re Winship*.

Second, I also believe that the trial court incorrectly instructed the jury that a reasonable doubt is not one

v. *Nickens*, supra, 955 F.2d 120 n.4; *United States* v. *Polan*, 970 F.2d 1280, 1286 (3d Cir. 1992), *cert. denied*, 507 U.S. 953, 113 S. Ct. 1367, 122 L. Ed. 2d 745 (1993) ("we do not necessarily recommend the future use of the terms ['an honest doubt,' and 'not a fanciful doubt'] challenged in the present appeal"); *Smith* v. *Bordenkircher*, 718 F.2d 1273, 1276 (4th Cir. 1983) ("[w]e share [the] generally disapproving view" of other appellate courts of equating reasonable doubt with good and substantial doubt); *United States* v. *Muckenstrum*, 515 F.2d 568, 571 (5th Cir.), *cert. denied*, 423 U.S. 1032, 96 S. Ct. 564, 46 L. Ed. 2d 406 (1975) (instruction that doubt must be substantial "would better be left unsaid"); *United States* v. *Alvero*, 470 F.2d 981, 982–83 (5th Cir. 1972) (court reversed conviction because trial court defined reasonable doubt, in part, as " 'any substantial reasonable doubt, common, ordinary horsesense doubt. . . . A very substantial doubt . . . .' "); *United States* v. *Wright*, 542 F.2d 975, 988 (7th Cir. 1976), *cert. denied*, 429 U.S. 1073, 97 S. Ct. 810, 50 L. Ed. 2d 790 (1977) (any court including substantial doubt language in its reasonable doubt instruction "can reasonably expect reversal"); *United States* v. *Atkins*, 487 F.2d 257, 260 (8th Cir. 1973) ("[p]roof of guilt beyond a reasonable doubt would seem to require a greater evidentiary showing by the Government than proof of guilt beyond a substantial doubt"); *Monk* v. *Zelez*, 901 F.2d 885, 890 (10th Cir. 1990) ("a jury instruction that utilizes substantial doubt language can and will require reversal unless it can be concluded beyond a reasonable doubt that the jury was not misled by this instruction"); *Harvell* v. *Nagle*, 58 F.3d 1541, 1543 (11th Cir. 1995), *cert. denied*, 517 U.S. 1225, 116 S. Ct. 1859, 134 L. Ed. 2d 958 (1996) ("use of the term 'actual and substantial doubt' is somewhat problematic and perhaps even ill-advised").

"raised by the ingenuity of counsel . . . and unwarranted by the evidence." This court recently stated that it agreed "that the phrase 'ingenuity of counsel' . . . could misdirect the jury's attention," and that "trial courts [should] avoid its further use." *State* v. *Taylor*, 239 Conn. 481, 504, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); see *United States* v. *Glenn*, 828 F.2d 855, 861 (1st Cir. 1987). Indeed, such an instruction "provides an incorrect inference: all defenses rely to a great extent on the 'ingenuity of counsel.' " *United States* v. *Glantz*, 847 F.2d 1, 11 (1st Cir. 1988). Accordingly, the denigration of the theory of defense by referring to the ingenuity of counsel has the effect of unconstitutionally easing the state's burden of proof.

Moreover, the combination of the "real doubt" and the "ingenuity of counsel" instructions, within the framework of the only two paragraphs defining reasonable doubt in the trial court's charge here; see footnote 1; severely undermines the presumption of innocence and further impermissibly lessens the state's burden of proof. It is as if the trial judge stated to the jury—"remember, there must be a substantial doubt in favor of the accused's innocence"—and added for good measure—"don't let the defense 'pull the wool over [your] eyes.' " See T. Haliburton, The Clock Maker (1839); see also *United States* v. *Friedman*, 909 F.2d 705, 708 (2d Cir. 1990) (while reversing defendant's conviction, Court of Appeals noted that District Court had sustained defendant's objection to prosecutor's reference to pulling wool down over eyes of jurors); *United States* v. *Resto*, 824 F.2d 210, 212 (2d Cir. 1987) (prosecutor's reference in closing statements that defense tried to pull wool over jurors' eyes was improper and trial court properly reprimanded prosecutor for making it).

Furthermore, I also believe that the "ingenuity of counsel" instruction infringes upon an accused's right

to counsel. This jury instruction must be viewed in the context that it is given to the jury—that is, after all the evidence has been presented and the state and defense counsel have made their final arguments. It is the last word before the jury begins its deliberation and from the jurors' perspective it must have relevance to the case—otherwise the judge would not have instructed the jury on the issue. The jury could reasonably interpret the "ingenuity of counsel" instruction as an admonition—do not let defense counsel's (not the state's attorney) trial tactics detract you from the truth—thereby implying (1) that defense counsel improperly employed trial tactics and (2) that the truth would require a guilty finding. The "ingenuity of counsel" instruction, therefore, in the eyes of the jury, serves only to disparage the efforts of defense counsel, and by implication, the defense theory of the case.

Because of the constitutional deficiencies in the reasonable doubt instruction in this case, the defendant is entitled to a new trial. In *Sullivan* v. *Louisiana*, supra, 508 U.S. 279, Justice Scalia, writing for a unanimous court with respect to identical jury instructions that caused reversal in *Cage* v. *Louisiana*, supra, 498 U.S. 40,[6] which included "substantial doubt," held that a reversal was required as a matter of constitutional law. He explained that "[a]lthough most constitutional errors have been held amenable to harmless-error analysis . . . some will always invalidate the conviction. . . . The question in the present case is to which category the present error belongs. *Chapman* [v. *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)] itself suggests the answer. Consistent with the jury-trial guarantee, the question it instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict

---

[6] See footnote 3 of this dissent.

in the case at hand. See [id., 24] (analyzing effect of error on 'verdict obtained')." (Citations omitted.) *Sullivan* v. *Louisiana,* supra, 279.

Justice Scalia continued in *Sullivan* that "[h]armless-error review looks, we have said, to the basis on which 'the jury actually rested its verdict.' *Yates* v. *Evatt,* 500 U.S. 391, 404 [111 S. Ct. 1884, 114 L. Ed. 2d 432] (1991) . . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee. See *Rose* v. *Clark,* 478 U.S. 570, 578 [106 S. Ct. 3101, 92 L. Ed. 2d 460] (1986); id., [593] (Blackmun, J., dissenting); *Pope* v. *Illinois,* 481 U.S. 497, 509–10 [107 S. Ct. 1918, 95 L. Ed. 2d 439] (1987) (Stevens, J., dissenting).

"Once the proper role of an appellate court engaged in the *Chapman* inquiry is understood, the illogic of harmless-error review in the present case becomes evident. Since, for the reasons described above, there has been no jury verdict within the meaning of the Sixth Amendment, the entire premise of *Chapman* review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt,[7] the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no object, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury

[7] "[W]here the instructional error consists of a misdescription of the burden of proof, [it] vitiates all the jury's findings." *Sullivan* v. *Louisiana,* supra, 508 U.S. 281.

would surely have found [the] petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough. See *Yates* [v. *Evatt*, supra, 500 U.S. 413–14] (Scalia, J., concurring in part and concurring in judgment). The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty. See *Bollenbach* v. *United States*, 326 U.S. 607, 614 [66 S. Ct. 402, 90 L. Ed. 350] (1946)." *Sullivan* v. *Louisiana*, supra, 508 U.S. 279–80.

Accordingly, the Supreme Court in *Sullivan* refused to employ a harmless error analysis,[8] and we likewise should refuse to do so in this case. Although Justice Rehnquist in his concurring opinion in *Sullivan* employed a less sweeping analysis as to why harmless error is inappropriate, he agreed with respect to the reasonable doubt instruction. "A constitutionally deficient reasonable-doubt instruction will always result in

---

[8] "*Another mode of analysis leads to the same conclusion that harmless-error analysis does not apply*: In [*Arizona* v. *Fulminante*, 499 U.S. 279, 309, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)], we distinguished between, on the one hand, structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards . . . and, on the other hand, trial errors which occur during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented, id., [307–308]. Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former sort, the jury guarantee being a basic protectio[n] whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function, *Rose* [v. *Clark*, supra, 478 U.S. 577]. The right to trial by jury reflects, we have said, a profound judgment about the way in which law should be enforced and justice administered. *Duncan* v. *Louisiana*, [391 U.S. 145, 155, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968)]. The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." (Citation omitted; internal quotation marks omitted.) *Sullivan* v. *Louisiana*, supra, 508 U.S. 281–82.

the absence of 'beyond a reasonable doubt' jury findings. That being the case, I agree that harmless-error analysis cannot be applied in the case of a defective reasonable-doubt instruction consistent with the Sixth Amendment's jury-trial guarantee." Id., 285 (Rehnquist, J., concurring).

Nevertheless, even if we were to employ a form of harmless error analysis as the court seems to have done in *United States* v. *Doyle*, supra, 130 F.3d 535–39, I would come to the same conclusion that the defendant is entitled to a new trial. In *Doyle*, unlike this case, the jury instructions were appropriately worded on the burden of proof in another part of the charge. The Second Circuit Court of Appeals stated that "[w]hile th[e] final section of the [trial] court's instructions was undoubtedly more appropriately worded than was [the trial court's] reference to guilty defendants, [it] nevertheless agree[d] with Judge Frank's remark in his [*United States* v. *Farina*, 184 F.2d 18, 21 (2d Cir. 1950)] dissent: 'What influences juries, courts seldom know.' . . . We cannot be sure whether [the defendants'] jury actually misunderstood its obligations under the presumption of innocence and the reasonable doubt standard." *United States* v. *Doyle*, supra, 539.

The Second Circuit further explained in *Doyle* that it "need only determine whether there is a reasonable likelihood, even if less than a probability, that the jury misunderstood these principles of law. As discussed above, we are persuaded that the charge in its entirety created more than a possibility of jury misinterpretation and risked the factual error and unjust conviction against which [*In re Winship*] warned. We therefore hold that it created a reasonable likelihood that the jury misunderstood the reasonable doubt standard and the presumption of innocence." Id.

I would, therefore, reverse and remand this case for a new trial, "with the expectation that [this court is]

not likely again to see this ill-advised language included in instructions given by [trial courts]." Id., 539–40.

Finally, the court today adopts and modifies certain rules of evidence that continue to lead us down a dangerous path that allows convictions to be based upon hearsay evidence—evidence not subject to the time-honored test of cross-examination. The majority does so under the guise that such statements are admissible "to affect credibility only and not to establish the truth of the statement" and the jury is instructed accordingly. To believe that the jury, untrained in the law, is able to limit their consideration of the hearsay evidence to credibility and not accept it for substantive purposes is to live—like Don Quixote—in a dream world. Nevertheless, for obvious reasons I do not reach the evidential ruling.

Accordingly, I dissent.